# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ESTATE OF CHARLES LEON WEATHERFORD, by and through Carla Thompson, as Special Administratrix<br><br>Plaintiff,<br><br>v.<br><br>(1) BOARD OF COUNTY COMMISSIONERS OF MUSKOGEE COUNTY;<br>(2) CHARLES PEARSON, as Sheriff of Muskogee County; and<br>(3) DEBBIE TAYLOR, individually;<br><br>Defendants. | Case No. CIV-08-088-RAW |

## ORDER & OPINION

Before the court are motions for summary judgment filed by the Board of County Commissioners of Muskogee County (the "Board") [Docket No. 78], Sheriff Charles Pearson [Docket No. 79], and Debbie Taylor [Docket No. 83]. This action is brought on behalf of the Estate of Charles Leon Weatherford by and through Carla Thompson as Special Administratrix. For simplicity in this Order and Opinion, the court simply refers to Plaintiff as "he" or "him" in reference to Charles Leon Weatherford.

At the time of the actions complained of, Plaintiff was a pre-trial detainee at the Muskogee County Detention Center ("the jail"). In his Complaint, Plaintiff claims that he first started

complaining of chest pain and left arm numbness[1] at approximately 5:30 a.m.[2] on June 28, 2007. He claims that he continued to feel chest pain and repeatedly requested medical attention throughout the day, but that jail personnel refused to take him to the hospital or call an ambulance and told Plaintiff that he was faking. He claims that jail personnel finally called for an ambulance at approximately 4:08 a.m., about five minutes after Plaintiff collapsed into unconsciousness. Plaintiff was pronounced dead at approximately 4:55 a.m. on June 29, 2007 of a heart attack.

Plaintiff filed his Complaint on March 5, 2008, alleging violations of his civil rights pursuant to 42 U.S.C. § 1983 based on the events that occurred from June 28, 2007 through June 29, 2007. Plaintiff also requests damages under Oklahoma's wrongful death statute and an award of punitive damages based on the same events.

## **BACKGROUND**

The court views the evidence and draws reasonable inferences therefrom in the light most favorable to Plaintiff.[3] Plaintiff was a pre-trial detainee in the Muskogee County Detention Center

---

[1] While the Complaint refers to *left* arm numbness, in the motions for summary judgment and responses, the parties seem to agree that Plaintiff actually had *right* arm pain.

[2] While the Complaint states that he first started complaining around 5:30 a.m., in his summary judgment responses, he states that he first complained before 11:30 p.m. or around 11:17 p.m.

[3] Defendant Taylor objects to Plaintiff's Proposed Undisputed Material Facts, as the document is not in compliance with Local Civil Rule 5.2(a) and exceeds the page limit allowed by Local Civil Rule 7.1(d) without leave of court. The court shares Defendant's frustration and is amazed by Plaintiff's counsel's frequent disregard for the rules. The court will not, however, strike the document. As tedious as it may be, any additional evidence will assist the court in its rulings on the motions now before the court. Instead the court warns Plaintiff's counsel that future disregard for the rules will result in such a document being stricken from the record.

from April 19, 2007 until his death on June 29, 2007. Michael Gray was the shift supervisor for the 4:00 p.m. to midnight shift at the jail on June 28, 2007. Debbie Taylor took over at midnight and was the shift supervisor for the midnight to 8:00 a.m. shift on June 29, 2007.

At least as early as 11:17 p.m. on June 28, 2007, employees at the jail were aware that Plaintiff was complaining of chest pains. He complained of chest pains and pain going down his right arm. At least one jail employee and more than one inmate observed that Plaintiff was very short of breath. Plaintiff repeatedly stated that he was having a heart attack and asked to go to the hospital. Jail staff contacted medical personnel who were not at the jail that night to have them determine if they should send Plaintiff to the hospital.

The jail's medical employees determined that his chest pains and right arm pains were probably not symptoms of a heart attack, but perhaps symptoms of an anxiety attack. The medical employees made this determination based upon what they had been told by jail staff, not upon examination. They noted that Plaintiff's pain was in the "wrong arm," as typically, a patient's left arm rather than right arm is affected by a heart attack.

Kim Farmer, a medical employee, phoned Debbie Taylor at approximately 12:30 a.m. and told her of the medical staff's determination. Debbie Taylor testified that because the jail's medical employees had told her that Plaintiff was not having a heart attack, she did not believe he was having a heart attack. Taylor did, however, have a runner go check on Plaintiff. Taylor claims that she did not personally check on Plaintiff, as jail policy directs that female officers are not to go into male cell blocks unless it is an emergency.

At approximately 1:45 a.m. Debbie Taylor had Plaintiff moved to "the cage," an observation cell on the lower level. Debbie Taylor testified that she could see into the cage from where she sat

at the "booking desk." The parties do not dispute that at the very least, she could see into the cage from a window next to the booking desk. According to Taylor, she performed 15-minute checks on Plaintiff while he was in the cage by looking at him through her window. She also had a runner doing checks on him. She never personally performed a medical assessment on Plaintiff. The parties agree that she never came into the cage area and spoke to Plaintiff while he was in the cage.

While he was in the cage, at least one other inmate attempted to get help for Plaintiff by using the intercom. Plaintiff claims several inmates buzzed their intercoms on his behalf until their intercoms were shut off by jail staff. Debbie Taylor does not dispute that she had some sort of contact with Plaintiff via the intercom. Plaintiff has presented evidence to suggest that Taylor dismissed the inmates' pleas and told them to shut up, that they were not doctors and that they did not know if Plaintiff was having a heart attack. Plaintiff also claims that Taylor said Plaintiff was "faking it."

Taylor and other jail staff observed Plaintiff walking around his cell and conversing with his cell mate from the time he was moved until approximately 4:10 a.m. when he collapsed. According to Taylor, Plaintiff never asked her for help or to go to the hospital. She stated that he could have "waved" at her at anytime while he was in the cage.[4] When Plaintiff collapsed, jail staff went to his cell, determined that he was not breathing, and performed CPR procedures.

Debbie Taylor has a ninth grade education. She started working at the jail in 2005. Taylor took an eight hour first aid class that included CPR training and a component dealing with heart

---

[4]Given that, according to Taylor, she never personally spoke to Plaintiff or interacted with him, the court is unsure how she expected Plaintiff to know to wave at her. Perhaps she just assumed that if he was seriously in need of medical attention, he might wave at anyone peering at him through a window whether or not he knew that person.

4

attacks, including how to recognize the first signs of a heart attack and how to use a defibrillator. According to her testimony, there was a copy of the policy and procedure manual in the "main control" area, and she was told what was in the manual. Taylor testified that the nurse on call the night of Plaintiff's death was Kim Farmer. Taylor also testified that she assumed that anyone in scrubs or who worked in "medical" was a nurse. Before calling a nurse, Taylor would personally check on a female inmate, but would send an available runner to check on a male inmate.

Plaintiff claims that the staff at the jail was not trained adequately, that the policies and customs in the jail were inadequate, and that the Board failed to provide the Sheriff with adequate funding to properly operate the jail. Chest pain is not listed as an emergency in the jail's "emergency definition" in the policy manual. The Sheriff receives funds to run the jail from the Board and from other sources. The Board annually approves the Sheriff's budget for the jail, and during Sheriff Pearson's term in office, has never given him the full amount he has requested. The Board is not involved in the hiring or firing of the jail's or the Sheriff's employees. The Board does not set or review any of the jail's or the Sheriff's policies. The Board is not involved in running the jail. The Sheriff sets policies for the jail, runs the jail, and does the hiring and firing of jail employees.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying the summary judgment standard, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to Plaintiff. Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1258

(10th Cir. 2006). All doubts will be resolved in Plaintiff's favor. At this stage, however, Plaintiff may not rely on mere allegations, but must have set forth, by affidavit or other evidence, specific facts in support of his Complaint. Id.

**The Board's Motion**

42 U.S.C. § 1983 Claims

Plaintiff does not argue that the Board or any of the individual Commissioners were directly involved in the actions upon which this lawsuit is based. Instead, he claims that the Board's inadequate policies, procedures or customs caused those actions.

The Board first argues that Plaintiff has not presented and cannot present evidence that a policy or custom of the Board caused the alleged constitutional violation against him; and therefore, the § 1983 action against the Board must be dismissed. As the Board argues, liability under § 1983 cannot be based on a *respondeat superior* theory. Monell v. Dep't of Social Services, 436 U.S. 658, 691 (1978). The Board "may be held liable under 42 U.S.C. § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998). The Board is only liable if Plaintiff can show that an official policy of the Board is the "moving force" behind his alleged injury. He must show "that the county took official action with a requisite degree of culpability and there is a direct causal link between the action and deprivation of federal rights." Lopez v. LeMaster, 172 F.3d 756, 763 (10th Cir. 1999) (citing Board of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997)).

"Under Oklahoma law, the Board has no statutory duty to hire, train, supervise, or discipline the county sheriffs or their deputies." Meade v. Grubbs, 841 F.2d 1512, 1528 (10th Cir. 1988).

6

"Consequently, unless the Commissioners voluntarily undertook responsibility for hiring or supervising county law enforcement officers, which is not alleged, they were not 'affirmatively linked' with the alleged [constitutional deprivation]." Id. Plaintiff provides no evidence that the Commissioners undertook any responsibilities with regard to running the jail or hiring or supervising jail employees. Plaintiff also does not provide any evidence that the Board was involved in creating the jail's policies or customs.

Plaintiff does provide evidence, however, that the Board annually approves the Sheriff's budget to run the jail and has never, since Sheriff Pearson has been in office, given him the amount he has requested for that purpose. The Board argues that one of the Commissioners does not recall any occasion when the Sheriff requested more funds and was not approved. Of course, with evidence on both sides, the court must resolve any doubts in Plaintiff's favor.

Plaintiff relies on Lopez for the proposition that the Board shares § 1983 liability because the Sheriff informed the Board of his need for additional funds to run the jail and the Board did not meet that need. Lopez does stand for the proposition that evidence that a sheriff requested and was denied additional funds from a board of commissioners to run a jail may support a sufficient showing for summary judgment purposes that a county is liable under § 1983 for an inadequate policy. Plaintiff seems to miss entirely, however, the fact that the county liability being addressed in Lopez is the county liability that is present when a sheriff is sued in his official capacity. An action against a sheriff in his official capacity is the equivalent to an action against the county. Lopez at 172 F.3d at 762. The Sheriff, not the Board, is the proper defendant. Accordingly, the federal claims against the Board are dismissed.

State Claims

The state claims against the Board also fail as they are barred by Oklahoma's Governmental Tort Claims Act ("OGTCA"). The OGTCA, 51 O.S. § 151, et seq., governs claims against the state of Oklahoma, "its political subdivisions, and all of their employees acting within the scope of their employment." 51 OKLA. STAT. § 152.1(A). "The state, only to the extent and in the manner provided [in the OGTCA], waives its immunity and that of its political subdivisions. In so waiving its immunity, it is not the intent of the state to waive any rights under the Eleventh Amendment." 51 OKLA. STAT. § 152.1(B).

Oklahoma has not waived its immunity in this case, but rather has specifically preserved it in 51 OKLA. STAT. § 155(24). "The state or a political subdivision shall not be liable if a loss or claims results from . . . operation or maintenance of any prison, jail or correctional facility . . . ." Id. The OGTCA "categorically excludes liability for claims involving the 'operation or maintenance of any prison, jail or correctional facility.'" DeYonghe v. Ward, 121 Fed.Appx. 335, 339 (10th Cir. 2005) (citing 51 OKLA. STAT. § 155(24)). All of the claims in this action arise from the operation or maintenance of the jail. Accordingly, the state claims against the Board fail.

Punitive Damages

Additionally, Plaintiff has requested punitive damages. Punitive damages are not recoverable against municipal entities under § 1983. Youren v. Tintic School Dist., 343 F.3d 1296, 1307 (10th Cir. 2003). Oklahoma law also bars recovery of punitive damages against the State and its political subdivisions. 51 OKLA. STAT. § 154(C).

**Sheriff Charles Pearson's Motion**

42 U.S.C. § 1983 Claims

Plaintiff does not claim that the Sheriff personally took part in the alleged events giving rise to this action. Instead, Plaintiff sued Charles Pearson in his official capacity as the Sheriff of Muskogee County.[5] A suit against "a public servant in his official capacity imposes liability on the entity he represents. Meade, 841 F.2d at 1529. "Under Oklahoma law, a sheriff is responsible for the proper management of the jail in his county." Id. at 1528. The Sheriff is statutorily liable for the management of the jail. "The sheriff shall have the charge and custody of the jail of his county, and all the prisoners in the same, and shall keep such jail himself, or by his deputy or jailer, for whose acts he and his sureties shall be liable." 51 OKLA. STAT. § 513.

Plaintiff claims that the Sheriff failed to properly train and supervise his employees. The Sheriff is only liable in his official capacity if his employees deprived Plaintiff of his constitutional rights pursuant to a policy or custom. Monell, 436 U.S. at 690-91 (1978). "Such a custom or policy may include its continuing failure to train, supervise, or discipline its [employees]." Varela v. Jones, 746 F.2d 1413, 1418 (10th Cir. 1984). The facts surrounding the issues of the jail's policies and training practices are hotly contested, and a great deal of evidence has been presented by both sides. For example, Plaintiff has put forth evidence that the jail was under-funded[6], that jail staff were not properly trained on what to do during a medical emergency, and that the turn-over rate at the jail was

---

[5]The court notes that Plaintiff has brought this action against the Sheriff in his official capacity only, not in his individual capacity. The Sheriff is not entitled to qualified immunity in his official capacity. Moore v. City of Wynnewood, 57 F.3d 924, 929 n.4 (10th Cir. 1995).

[6]As noted above, evidence of under-funding may support a finding of an unconstitutional policy or custom.

very high such that some employees were not properly trained before taking on shifts.

The Sheriff also argues that Plaintiff has not proven that any employee was deliberately indifferent to Plaintiff's medical needs or that a constitutional violation occurred, and thus the Sheriff is not liable in his official capacity for any failure to train, supervise or discipline his employees. Again, as Plaintiff argues, the facts on this issue are hotly contested. "The parties disagree as to when he complained of chest pain, who talked to him, when he was talked to, what time the 'nurse' was called, what the 'nurse' actually said, what advice was given, whether anyone on staff noticed the severity of his symptoms or not, whether he was being checked on regularly or not, whether anyone was properly monitoring him, whether he ever requested to go to the hospital, [and] whether he manifested symptoms a lay person would recognize as needing to go to the hospital." Plaintiff's Response in Opposition to Defendant Pearson's Motion for Summary Judgment, pp. 1-2. Viewing this controverted evidence in the light most favorable to Plaintiff, the court cannot grant the summary judgment motion against the Sheriff on the federal claims.

State Claims

Plaintiff's state claims against the Sheriff fail, however, for the same reason they fail against the Board – they are barred by the OGTCA. An action against a state official in his official capacity is not an action against the official, but rather an action against his office. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). As noted above, the OGTCA bars actions against the state and its political subdivisions when the claims are based on incidents that occurred during the operation or maintenance of any prison, jail or correctional facility. 51 OKLA. STAT. § 155(24). Accordingly, those claims are hereby dismissed.

10

Punitive Damages

Likewise, for the same reason he cannot recover punitive damages against the Board, Plaintiff may not recover punitive damages against the Sheriff in his official capacity – they are barred by § 1983 and 51 OKLA. STAT. § 154(C).

**Debbie Taylor's Motion**

42 U.S.C. § 1983 Claims

Plaintiff sued Debbie Taylor in her individual capacity only. Debbie Taylor was an employee of the Muskogee County Sheriff's Department during the times relevant to this action and was the shift supervisor on duty at the jail on the morning of Plaintiff's death. Taylor argues that she is entitled to qualified immunity on Plaintiff's § 1983 claims.

Qualified immunity questions are decided differently than other summary judgment decisions. Vondrak v. City of Las Cruces, 535 F.3d 1198, 1204 (10th Cir. 2008). "When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right." Id. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). If a plaintiff shows that a constitutional violation occurred, the question then becomes whether the constitutional right was clearly established. Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." Id. at 1204-05.

Accordingly, the court first addresses the issue of whether Plaintiff has established that Defendant Debbie Taylor violated a constitutional right. "A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The test to determine whether a prison official has exhibited deliberate indifference "involves both an objective and subjective component." Id.

To meet the objective prong, Plaintiff must set forth facts to show that his medical need was objectively sufficiently serious, and that Taylor's delay in meeting that need caused him substantial harm. Id. at 752. The fact that Plaintiff complained of chest pain and ultimately suffered a heart attack and died is sufficient to satisfy this "sufficiently serious" or objective prong. See id. at 753-54. "[S]evere chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard." Id. at 754. Plaintiff has provided evidence that he suffered severe chest pain for several hours. It undisputed that he ultimately had a heart attack and died.

To meet the subjective prong, Plaintiff must provide evidence to support his claim that Debbie Taylor knew and disregarded a substantial risk of harm to his health and safety. Id. at 752. Plaintiff must present "evidence sufficient to support a claim that [Taylor] exhibited 'deliberate indifference' to [his] serious medical needs." Id. at 755. The court can find that Taylor exhibited "deliberate indifference" without "a finding of express intent to harm." Id. at 752. All Plaintiff needs to show is that Taylor failed to act even though she had "knowledge of a substantial risk of serious harm." Id. Moreover, Taylor "would not escape liability if the evidence showed that [she]

merely refused to verify underlying facts that [she] strongly suspected to be true, or declined to confirm inferences of risk that [she] strongly suspected to exist." Id.

On the one hand, Taylor testified that she was told by Kim Farmer, a medical employee, that Plaintiff was not having a heart attack, that the "wrong arm" was hurting, and that he would be fine until morning. She sent runners to check on Plaintiff, she moved him to the observation cage, and she performed 15-minutes "checks" on him by looking at him through the window. Taylor testified that she did not believe Plaintiff was having a heart attack.

On the other hand, no medical employee ever actually examined Plaintiff. Moreover, Plaintiff has produced evidence to show that he continued to complaint of chest pain and that at least one inmate buzzed the intercom to let Taylor know that Plaintiff was suffering and possibly having a heart attack. He has also produced evidence to show that rather than personally get a good look at him, she simply peered at him through her window, told the inmates they were not qualified to know whether he was having a heart attack, and assumed that because he did not wave at her through the window, Plaintiff was fine.

While Taylor claims she believed Plaintiff was not suffering a heart attack, she based this belief entirely on the word of a medical employee who never examined Plaintiff and who based her "diagnosis" entirely on the fact that the Plaintiff complained of pain in the "wrong arm." Even though Plaintiff continued to complain of chest pain, Taylor refused to even check him out personally and confirm or verify whether his pains might be serious enough to necessitate a trip to the hospital.[7] Taylor refused to take this simple step even though she was the one to make the call

---

[7]Taylor never said that a policy existed that would prevent her from personally checking on Plaintiff while he was in the cage. Moreover, in this court's humble opinion, chest pains should be considered an emergency, which would have justified her checking on Plaintiff in his cell.

13

as to whether Plaintiff would be allowed to visit the hospital. The court believes Plaintiff has produced evidence sufficient to support a claim that Taylor was deliberately indifferent to his serious medical needs, and thus that a constitutional right was violated.

Moreover, the Tenth Circuit has noted that "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." Id. at 749. Accordingly, summary judgment is denied as to the federal claims against Taylor.

State Claims & Punitive Damages

The OGTCA governs actions against not only the state and its political subdivisions, but also actions against "all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions." 51 OKLA. STAT. § 152.1(A). Section 163 bars suits against an employee of the state or a political subdivision acting within the scope of her employment. Section 152(11) defines "scope of employment" as:

> performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority including the operation or use of an agency vehicle or equipment with actual or implied consent of the supervisor of the employee, but shall not include corruption or fraud.

An employee acts outside the scope of employment when she acts maliciously or in bad faith. Pellegrino v. State of Oklahoma ex rel. Cameron Univ., 63 P.3d 535, 537 (Okla. 2003).

As Defendant notes, Plaintiff does not dispute that Debbie Taylor was acting within the scope of her employment. In fact, while Plaintiff requests that Taylor's motion for summary judgment be denied in its entirety, Plaintiff does not rebut Taylor's arguments or present any argument that would support his state law claims or his punitive damages claims against Taylor. Moreover, as Defendant notes, Plaintiff has not presented any evidence that Taylor acted maliciously or in bad faith. Taylor's

14

motion with regard to these claims is deemed confessed pursuant to Federal Rule of Civil Procedure 56(e)(2). The court believes summary judgment is proper on these claims.

## CONCLUSION

Accordingly, the Board's motion [Docket No. 78] is hereby GRANTED. The Board is hereby DISMISSED. Charles Pearson's motion [Docket No. 79] is hereby GRANTED in part and DENIED in part. The federal claims against the Sheriff remain, and the state claims against him are DISMISSED. Debbie Taylor's motion [Docket No. 83] is hereby GRANTED in part and DENIED in part. The federal claims against Taylor remain, and the state claims against her are DISMISSED.

IT IS SO ORDERED this 10th day of February, 2009.

**Dated this 10th Day of February 2009.**

J4h4i0

_Ronald A. White_
Ronald A. White
United States District Judge
Eastern District of Oklahoma